UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY J. LEAF, individually and as personal representative of the Estate of JOHN PATRICK LEAF, Deceased, MARTHA A. LEAF, and CHARMAYNE E. THOMAS, minor child of JOHN PATRICK LEAF, by her next friend, LARRY J. LEAF, <br>　　　　Plaintiffs, <br><br>　　vs. <br><br>MARION COUNTY SHERIFF JACK COTTEY, in his official capacity, and DEPUTY RONALD SHELNUTT, in his individual capacity, <br>　　　　Defendants. | 1:02-cv-433-LJM-VSS |

**ORDER ON MOTION IN LIMINE REGARDING**
**LARRY DANAHER, DAVID BALASH AND DR. MICHAEL MULLINS**

This matter is before the Court on the motion in limine of the defendants, Marion County Sheriff Jack Cottey ("Sheriff") and Deputy Ronald Shelnutt ("Deputy Shelnutt") (together, "Defendants") to exclude three of the plaintiffs', Larry J. Leaf, Martha A. Leaf and Charmayne E. Thomas by her next frien2d Larry J. Leaf (collectively, "Plaintiffs"), witnesses from testifying in whole or in part. Specifically, Defendants seek to exclude Larry Danaher altogether as an expert witness; to preclude Plaintiffs from qualifying David Balash as an expert in the fields of forensic pathology/autopsy or blood spatter analysis or from offering his testimony or portions of his report related to these fields at trial, and to preclude the Plaintiffs from offering the testimony of Dr. Michael Mullins in the fields of sleep cycle research, forensic pathology or the behavioral and cognitive effects of alcohol on John Leaf. For the reasons explained fully below, Defendants' motion is **GRANTED in part and DENIED in part**.

## I. BACKGROUND

The facts of this case are familiar and the Court need not recite them here. However, some background may be useful to put Plaintiffs' proposed experts in context. The claims that remain in this case for trial are Plaintiffs' claim against Deputy Shelnutt for use of excessive force in violation of John Leaf's ("Mr. Leaf") Fourth and Fourteenth Amendment rights, and Plaintiffs' state law claim against the Sheriff for negligent hiring, retention and supervision. Plaintiffs seek to prove that Mr. Leaf did not pose a threat of death or serious harm to Deputy Shelnutt; thus, Deputy Shelnutt's use of deadly force against Mr. Leaf was unreasonable. Plaintiffs have retained witnesses for trial that they seeks to qualify as experts to help prove that Mr. Leaf did not or physically could not have threatened Deputy Shelnutt, and that Deputy Shelnutt's use of force was excessive. Plaintiffs also seek to show that Deputy Shelnutt's version of the events related to the shooting are not credible. Defendants challenge some of Plaintiffs' experts and the testimony they have offered. The Court deals with each of these challenges below.

## II. STANDARD

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies

2

to all expert testimony, not just testimony based in science." Ad. Comm. Notes to FED. R. EVID. 702. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). "The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact." Ad. Comm. Notes to FED. R. EVID. 704.

*Daubert* requires the Court to examine closely the scientific technique or theory upon which the expert's conclusions are based. *See Daubert*, 509 U.S. at 593-94. However, the *Daubert* framework also is applicable to experts outside the fields of hard science. *Kumho Tire Co.*, 526 U.S. at 141; *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). First, using the *Daubert* criteria for guidance, the Court must be sure the work done by the expert meets the standards of intellectual rigor expected of an expert in that field. *Tyus*, 102 F.3d at 263. Second, the Court must determine whether the expert's testimony is based on his special skills or expertise. *Id.* Finally, the Court must determine whether the testimony will assist the trier of fact to understand or determine a factual issue. *Id.*

### III.  DISCUSSION

#### A.  LARRY P. DANAHER

As a preliminary matter, Danaher offers the opinion that "Deputy Shelnutt and Deputy Jacobs deviated from minimally accepted police standards and practices in the manner in which they responded to an unanswered 911 call and 30-minute delayed possible burglary." Expert Report of Larry P. Danaher ("Danaher Report") at 5. Danaher concludes that the deputies' improper response at the scene of the shooting caused the situation to escalate to the use of deadly force. *Id.* at 8. The Seventh Circuit Court of Appeals has determined that Deputy Shelnutt acted reasonably in his search

and seizure. *Leaf v. Shelnutt*, 400 F.3d 1070, 1081-82, 1085, 1088, 1091 (7th Cir. 2005). Thus, Deputy Shelnutt's conduct before the time of the shooting is no longer relevant, and the jury will have no need for Danaher's opinion in this regard.

As the Court already ruled in its Order on Motion to Strike Plaintiffs' Experts' Affidavits, the Court cannot admit Danaher's opinions and conclusions because Plaintiffs have not demonstrated that they are based upon a particular theory, methodology or standard. To meet the proper standards of intellectual rigor, an expert must articulate the theories, methodologies or standards upon which his opinions and conclusions are based. *See Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). The expert must at least explain how his experience has led to his conclusions. *Id.* The Court cannot determine whether an opinion is reliable if the expert does not relate his opinion to some standard learned through his experience in the field.

Danaher addresses issues of the Marion County Sheriff's Department's "lack of supervision and discipline" and "lack of training." Danaher Report at 8-14. Danaher offers that "The Marion County Sheriff's Department shows a pattern of allowing their Deputies to violate policy and training standards" and that "Shelnutt acted in a deviant manner on at least three occasions." *Id.* at 9. As to training, Danaher opines that "If Deputy Shelnutt and Deputy Jacobs had been trained adequately and appropriately for the task to which they were assigned, they would not have initiated the encounter on May 5, 2001, in the manner in which they did."

Danaher reviewed several boxes of documents, including Marion County Sheriff's Department ("MCSD") internal affair complaints and personnel files, as well as depositions taken in this case. Affidavit of Larry P. Danaher ("Danaher Aff.") ¶ 16. Danaher also reviewed all MCSD training documents that were produced by Defendants in discovery. Danaher Report at 2.

However, Danaher does not explain how he derived his opinions regarding MSCD's supervision, discipline or training. While he clearly has many years of experience, Danaher does not demonstrate any connection between that experience and his opinions. Danaher offers no baseline or statistics to which MSCD can be compared, even from his own experience. As to a lack of discipline or supervision, the only comparison Danaher has acknowledged is from his "common knowledge" and analyzing the Los Angeles Police Department. Deposition of Larry P. Danaher ("Danaher Dep.") at 95-96. Nor does Danaher offer any methodology or theory for determining when a sheriff's department's hiring, training or supervision policies are inadequate. Danaher's opinions about MCSD's training, supervision and discipline do not meet the requirements of *Daubert* or *Kumho Tire*.

As to his opinion on Shelnutt's hiring, Danaher opines that MCSD hired Deputy Shelnutt because it did not exercise reasonable care and that Deputy Shelnutt had "no respect for the law." *See* Danaher Report at 15-16. The Court cannot admit Danaher's legal conclusion that MCSD failed to use reasonable care in hiring Deputy Shelnutt. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994). Further, Danaher's opinion again lacks any connection to his experience or any useful theories or standards.

As the Court stated in its Order on Motion to Strike, Danaher's opinion as to MCSD's investigation into the use of force is irrelevant. Nothing that happened after the shooting could have caused Mr. Leaf's alleged constitutional deprivations. An expert's opinion must be useful and relevant to be admissible. *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002).

Danaher's ultimate opinion is:

> All of the inadequate training, absence of training, inadequate policies, practices, rules, and procedures, lack of policies, rules and procedures and unconstitutional

5

> policies, practices and procedures, unconstitutional de fact policies and condoning of excessive force by the defendant officers are pervasive, usual and recurring, grossly negligent, reckless and constitute a deliberate and conscious choice which evidence a deliberate indifference by the defendant and are the direct casual [sic] link to the illegal seizure and excessive force which ultimately resulted in John Leaf's death.

Danaher Report at 17. While an expert may testify as to an ultimate issue of fact, the Court cannot accept as true an expert's legal conclusions. *See Berry*, 25 F.3d at 1353-54. Danaher's opinions do not meet the requirements of reliability or relevance the Federal Rules require; he makes no connection between his opinions and his experience or skills that would be helpful to the jury. Defendants' motion in limine to exclude Danaher as an expert witness is **GRANTED**.

### B.  DAVID E. BALASH

Defendants seek an order in limine to preclude Balash from giving expert testimony in the areas of forensic pathology and blood spatter analysis. Defendants argue that Balash is not qualified to testify as an expert in these areas, and that his opinions are not reliable. Motion at 11.

Balash's experience includes 20 years with the Michigan State Police, Forensic Science Division. Affidavit of David E. Balash ("Balash Aff.") ¶ 2. Balash has experience in the laboratory and at crime scenes analyzing firearms, ammunition, residue, bullet trajectory, blood spatters, and evidence collection and preservation. *Id.* ¶ 4. Balash has advised medical personnel and assisted at autopsies. *Id.*

Balash has had professional training in a variety of firearms, as well as blood spatter interpretation, wound ballistics, and crime scene reconstruction. *Id.* ¶ 6. In 1989, Balash attended a three-day workshop on blood spatter analysis, designed for crime scene investigators to learn how to determine what has taken place at a scene based on blood spatters. Deposition of David E. Balash

("Balash Dep.") at 42-43. In 1997, Balash attended a two-day International Wound Ballistic Association Conference case study. *Id.* at 44.

Balash is a member of the International Wound Ballistics Association and an associate member of the International Association of Bloodstain Pattern Analysts. *Id.* at 45. To become a full member, Balash would have to attend a 40-hour formal training course. *Id.* at 45-46. Balash also has taught courses on blood spatter analysis. *Id.* at 51. Balash has testified as a blood spatter analyst in other cases, and consistently reviews publications from the International Association of Bloodstain Pattern Analysts. *Id.* at 47, 51.

### 1. Testimony regarding the autopsy

Balash offers the opinions that Dr. Pless's conclusions about the blood pattern on Mr. Leaf is not supported by the evidence or Balash's experience; that the autopsy procedure was deficient in that Mr. Leaf's body was cleaned before a thorough examination for firearms discharge residue; and that it is peculiar that no firearms discharge residue was noted around the wounds to the center chest or right shoulder wound.

Plaintiffs argue that Balash is not proffered as an expert examiner, but that he should be permitted to testify about autopsy procedure and autopsy report because "autopsy reports are certainly the type of information someone in his field relies upon." Response at 18. The Court presumes the field to which Plaintiffs refer is crime scene investigation and analysis. In regards to the autopsy, Balash does not make any opinions as to what caused or did not cause Mr. Leaf's death. Nor does he make a determination about whether the medical findings support one version of the facts or another. Instead, Balash is critical of the autopsy procedure and of Dr. Pless's testimony

about his findings during the autopsy. The Court finds that Balash's education and experience qualify him to testify on this matter; his lack of formal medical training does not preclude an opinion as to what he would expect to see from Mr. Leaf's autopsy protocol.

### 2. Blood Spatter Analysis

The parties agree that blood spatter analysis is a field of expertise, and a witness must be qualified as an expert to offer his opinion regarding blood spatter. The parties disagree, however, on whether Balash is qualified to testify about blood spatter based on his attendance at a three-day seminar, his 20-some years of experience interpreting bloodstain patterns, the fact that Balash teaches courses on blood spatter, and keeps current with literature in the field. The Court finds that Balash is qualified to offer his opinions at trial regarding blood spatter.

In *Gonzalez-Perez v. Gomez-Aguila*, 296 F. Supp. 2d 110, 116-17 (D. P.R. 2003), the court denied a motion in limine to exclude blood spatter testimony, where the proposed expert had attended a four-hour course on blood spatter and had over 20 years of experience with a state police department, examining blood patterns at crime scenes and in blood spatter interpretation. The court found it was impossible to determine from that evidence whether the witness was qualified. *Id.* at 117. In *United States v. Mustafa*, 22 M.J. 165, 166-67 (C.M.A. 1986), the court upheld the trial court judge's finding that an Army Criminal Investigation Command agent could testify as an expert in blood-flight analysis, although the agent had no medical or chemistry training. The CID agent had attended a five-day seminar on blood-flight analysis, had an unspecified amount of training through his CID schooling, and had practical experience as an investigator. *Id.* at 166. The court concluded

that the agent's testimony certainly could assist the trier of fact to determine a fact in issue. *Id.* at 168.

In comparison to the experts in these two cases, Balash fairs well. Balash has sufficient training and experience to testify in the field of blood spatter analysis.

### 3. Reliability and Helpfulness of Opinions

Defendants also claim that Balash's opinion are unreliable. They first argue that Balash bases his criticisms of the autopsy and autopsy report based solely on his own experience, which lacks the requisite independent indicia of reliability. As the Court explained above, Balash's opinions about the autopsy are not medical, and he sufficiently relates his opinions to his experience examining shooting victims at autopsies. *See* Opinion Letter of David Balash at 3, 7.

As for Balash's opinions about the order of the gunshots that hit Mr. Leaf and their probably affect on him, Balash refers in his deposition to the testimony of Dr. Pless and to his own experience. Balash Dep. at 86-88. Defendants do not challenge Balash's qualifications as an expert in ballistics, and the Court believes Balash's testimony regarding bullet trajectory will be helpful to the jury.

Defendants argue that Balash's opinions on blood spatter are unreliable because (1) he did not rely on literature regarding blood spatter analysis in making his conclusions, and (2) he did not conduct any blood spatter tests or studies. Defendants' arguments are not persuasive. Balash has significant experience in blood spatter analysis and his observations are based on that experience. Defendants principally rely on an Illinois appeals court opinion, *People v. Owens*, 508 N.E.2d 1088 (Ill. App. 1987), for their position that Balash should not be allowed to testify. In that case, the court focused on a number of deficiencies in the plaintiff's presentation of its witness as an expert,

including a lack of evidence that blood spatter analysis is a reliable subject for an expert, no explanation of the witness's training in or application of blood spatter analysis, and no evidence of tests that would demonstrate how certain bullet trajectories might produce certain blood spatters. *Owens*, 508 N.E.2d at 517-18. The court primarily was concerned with the scientific reliability of blood spatter evidence in general. That concern is not present here, and the Illinois court's reasoning is not germane. Defendants' motion in limine to preclude Balash from offering his opinions on the autopsy, ballistics and blood spatter is **DENIED**.

### C.  DR. MICHAEL E. MULLINS

Defendants challenge Dr. Mullins' qualifications as an expert and the reliability of his opinions as to Mr. Leaf's impairment and behavior based on the alcohol he had consumed, the position of Mr. Leaf's body when he was shot, Mr. Leaf's sleep cycle, and whether Mr. Leaf had been laying on a knife when he was awakened. Motion at 17.

#### 1.  Mr. Leaf's Sleep State

Dr. Mullins offers the opinion that at the time Deputies Shelnutt and Jacobs entered Mr. Leaf's apartment, he was in the deepest of four sleep states. Opinion Letter of Dr. Mullins ("Mullins Op. Ltr.") at 2; Deposition of Dr. Mullins ("Mullins Dep.") at 59-60. This opinion is based on the human sleep cycle, which Dr. Mullins explains begins at the deepest state, and the fact that approximately 22 minutes elapsed from the time Mr. Leaf's neighbors called 911 and the deputies' entrance. Mullins Op. Ltr. at 2. Dr. Mullins has explained that during this deepest sleep state "arousal is slower and more difficult, and the stimulus required to awaken someone is greater than

in lighter sleep states. It is more difficult for a person awakened from this sleep state to become oriented to his surroundings." *Id.*

Defendants' challenge Dr. Mullins' qualifications to offer his opinion of Mr. Leaf's sleep state. Dr. Mullins is not a neurologist or a sleep specialist. Dr. Mullins bases his opinion regarding Mr. Leaf's sleep cycle on his training and experience as a physician. Mullins Dep. at 59. Dr. Mullins' training in sleep cycles is limited to early medical school and his emergency medicine residency. *Id.* at 59-60. Sleep cycles are also of particular interest to Dr. Mullins personally, because of his work hours and change in work shifts. *Id.* at 59. Dr. Mullins attended lectures intended to advise physicians about sleep cycles and sleep physiology and how to get adequate sleep, particularly as an emergency room physician. *Id.* at 61-70. Defendants also challenge the reliability of Dr. Mullins' opinion, because Dr. Mullins did not consult any literature or studies on sleep cycles in reaching his conclusions.

The Court is satisfied that a medical doctor who has studied the stages of sleep, in however an elementary way, is qualified to testify that the initial sleep state is the deepest and the hardest from which to arouse a person. Dr. Mullins' opinion related to Mr. Leaf's sleep state is limited; he does not offer further sleep cycle analysis. The opinion does not consist of the kind of cerebral analysis that would require reference to specific literature or studies. Dr. Mullins will be permitted to testify as to this simple fact that he learned in his medical training, which the Court finds will be helpful for the jury. Defendants' motion to preclude Dr. Mullins from offering an opinion about Mr. Leaf's sleep state is **DENIED**.

### 2. Mr. Leaf's Potential Impairment

Defendants challenge the reliability of Dr. Mullins' opinion regarding the degree of Mr. Leaf's alcohol impairment. Defendants argue that although Dr. Mullins is a trained and certified medical toxicologist, he does not relate any toxicology methods to his conclusions about Mr. Leaf, and that he comes to his conclusion based solely on his experience treating intoxicated people in the emergency room. Dr. Mullins has testified that his experience in the emergency room has enabled him to observe behavioral impairment caused by alcohol, and then draw conclusions based on blood alcohol concentration.

Dr. Mullins' opinion that Mr Leaf was "clinically, modestly intoxicated" is based on the testimony of other witnesses. Mullins Dep. at 50-51. From that testimony, Dr. Mullins has determined that on the night he was killed, Mr. Leaf was in control of himself, able to understand what was going on around him, and able to make reasonable decisions. *Id.* at 51. Dr. Mullins also has determined that Mr. Leaf, generally and on the night he was killed, was friendly and outgoing when he was drinking alcohol. The Court finds this part of Dr. Mullins' opinion is not proper. It generally is hearsay, and Mr. Leaf's drinking habits are better described by first-hand witnesses. A toxicology expert is not needed to offer this opinion, and his opinions based on the testimony of other witnesses will not offer the jury insight that it cannot gain on its own.

Dr. Mullins also explains in his deposition that the same degree of legal intoxication, or blood alcohol concentration, effects different people differently, depending in part on a person's alcohol tolerance. *Id.* at 50, 58. Thus, Dr. Mullins has concluded that Mr. Leaf's alcohol tolerance lessened the impairment of his central nervous system caused by the alcohol he consumed the night he was killed. *Id.* at 58. While this part of Dr. Mullins' opinion sounds logical, Plaintiffs have not

demonstrated how it is based on any scientific methodology or calculations. It is not apparent that Dr. Mullins could make this conclusion based solely on his experience as an emergency medicine doctor. For these reasons, Defendants' motion to preclude Dr. Mullins from offering his opinion as to the effects of alcohol on his behavior the night he was killed is **GRANTED**.

### 3. Mr. Leaf's "Manner of Death"

Because Dr. Mullins is not a pathologist, Defendants argue he is not qualified to render opinions about Mr. Leaf's cause of death or "related circumstances." Motion at 22. Dr. Mullins is not formally trained in forensic pathology, ballistics, firearms or crime scene investigation. Dr. Mullins has never performed an autopsy. Mullins Dep. at 117. Dr. Mullins has training in emergency medicine and advanced trauma life support. *Id.* at 79. During his time as an emergency room doctor, Dr. Mullins has treated trauma patients, including "dozens" of gunshot victims, and has attended lectures and seminars regarding gunshot wounds. As a flight surgeon in Operation Desert Storm, Dr. Mullins treated approximately 15 soldiers with gunshot or shrapnel wounds. *Id.* at 28.

It is not clear from Defendants' motion exactly what parts of Dr. Mullins' opinion as to the "manner of death" are objectionable, but Plaintiffs have made clear that Dr. Mullins will not offer an opinion about the order of the three shots that hit Mr. Leaf. As to Mr. Leaf's positioning relative to the gun and to Deputy Shelnutt, Dr. Mullins opines only that Mr. Leaf was struck from above. Mullins Op. Ltr. at 3. This opinion is in agreement with Dr. Pless's autopsy report and is based on that report, photographs from the autopsy, and Dr. Pless's testimony. *Id.* Because Dr. Mullins' opinion on Mr. Leaf's opinion is limited to this statement, and appears to serve only as background

to the remainder of Dr. Mullins' opinion about Mr. Leaf's injuries, the Court will permit him to testify. Defendants' motion in limine to exclude Dr. Mullins' testimony about Mr. Leaf's injuries is **DENIED**.

### 4. Skin Imprint Analysis

Here, the challenge is to Dr. Mullins' opinion that "There is no physical evidence that Mr. Leaf was lying on top of a large knife with the knife under his back." *See* Mullins Op. Ltr. at 4. Dr. Mullins notes that the autopsy report and photograph demonstrate no imprint, impression or wound consistent with the report that Mr. Leaf was lying on the knife. *Id.* at 3.

Dr. Mullins' opinion about the lack of an impression on Mr. Leaf's skin is based on his experience and training as an emergency physician. Mullins Dep. at 93-94. Dr. Mullins has not been specifically trained on the affect that death has on a body's ability to retain impressions, and he is not aware of any medical specialty in skin imprint analysis. *Id.* at 93, 97. Dr. Mullins admits that he does not know what affect Mr. Leaf's death would have had on an imprint from the knife, but he would expect an imprint to survive Mr. Leaf's death. *Id.* at 97. Further, Dr. Mullins can only speculate as to how long Mr. Leaf would have had to lay on the knife for it to have caused an imprint on his back. *Id.* at 98.

Plaintiffs have not demonstrated that Dr. Mullins has any specific training, experience or knowledge that would qualify him to assist the jury in understanding skin imprints. Further, Dr. Mullins' opinion that the absence of a skin imprint from the knife is significant will mislead the jury, who is likely to afford undue weight to a physician's opinion. For these reasons, Defendants' motion to exclude Dr. Mullins' opinions about skin imprints is **GRANTED**.

## IV.  CONCLUSION

For all of the reasons set forth above the Court makes the following ruling on Defendants' motion in limine: The motion to exclude Danaher as an expert witness is **GRANTED**; the motion to preclude Balash from offering expert opinions on the subjects of Mr. Leaf's autopsy, ballistics, bullet trajectory and blood spatter analysis is **DENIED**; the motion to exclude Dr. Mullins' opinion about Mr. Leaf's sleep state is **DENIED**; the motion to preclude Dr. Mullins' from offering his opinion on the effects of alcohol on Mr. Leaf's behavior the night he was killed is **GRANTED**; the motion to exclude Dr. Mullins' opinions about Mr. Leaf's injuries is **DENIED**; and the motion to preclude Dr. Mullins' opinion about the lack of a skin imprint on Mr. Leaf's back is **GRANTED**.

IT IS SO ORDERED this 3rd day of June, 2005.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Laurel S. Judkins
OFFICE OF CORPORATION COUNSEL
ljudkins@indygov.org

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL
  & HASBROOK
jfk@rucklaw.com

Anthony W. Overholt
LOCKE REYNOLDS LLP

aoverholt@locke.com

Suzannah Wilson Overholt
OFFICE OF CORPORATION COUNSEL
soverhol@indygov.org

Stephen M. Wagner
WAGNER REESE & CROSSEN LLP
swagner@injuryattorneys.com